IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| STEPHEN DANIEL SHELTON, <br> Institutional ID No. 01869779, <br> SID ID No. 07883783, <br><br> Plaintiff, <br><br> v. <br><br> SUSAN BOEDEKER, *et al.*, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Civil Action No. 1:23-CV-00117-BU |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff STEPHEN DANIEL SHELTON, a prisoner currently incarcerated at the Texas Department of Criminal Justice (TDCJ) Clemens Unit and proceeding pro se, filed this action against defendants Susan Boedeker, Sandra A. Castillo, Olivia Herrera, and Christine M. Heady (collectively, Defendants) complaining that they were deliberately indifferent to his serious medical needs while he was incarcerated at TDCJ's Wallace Unit. Dkt. No. 1. Shelton received leave to proceed *in forma pauperis* which subjects his claims to the Court's preliminary screening under 28 U.S.C. § 1915. Dkt. No. 19. And because he is incarcerated and sues a government entity, officer, or employee, his claims are also subject to screening under 28 U.S.C. § 1915A.

On May 19, 2023, District Judge Keith P. Ellison for the Southern District of Texas severed and transferred Shelton's claims against the Defendants to the Abilene Division. Dkt. No. 7. United States District Judge James Wesley Hendrix then transferred this action

to the undersigned under 28 U.S.C. § 636(b) for screening. Dkt. No. 20. Because Shelton has not consented to the undersigned exercising jurisdiction of the Court, the undersigned submits these Findings, Conclusions, and Recommendations (FCR) to address whether Shelton's claims survive judicial screening.

After careful consideration of the claims in Shelton's Complaint, Dkt. No. 1, his Amended Complaint, Dkt. No. 17, and his supplementation of those claims through his responses to the Court's questionnaire, *see* Dkt. No. 25, the undersigned recommends that the Court DISMISS Shelton's claims for failure to state a claim upon which relief may be granted.

## I.     BACKGROUND

Through his Complaint,[1] Shelton complains that Defendants failed to provide adequate medical care with respect to an eye condition that he states began on August 9, 2021, and went undiagnosed until he saw a specialist on November 3, 2021. Dkt. No. 1 at 11. When Shelton first noticed symptoms of this condition, he was incarcerated at the TDCJ Byrd Unit. His claims against the Byrd Unit officials remains pending in the Southern District of Texas. *See Shelton v. Curry, et al.*, Civil Action No. 4:23-CV-01799, in the Southern District of Texas.

Shelton states that he first "noticed increased blurry vision" on August 9, 2021, and reported this to an officer at the Byrd Unit. *Id.* at 7. Due to Covid protocols at the Unit, he

---

[1] Shelton did not seek leave to file his Amended Complaint. Dkt. No. 17. However, upon review it appears that Shelton's Amended Complaint does not introduce new facts to the case and only attempts to sever his claims that have already been severed by Judge Ellison in the transfer order. *See* Dkt. No. 7. Accordingly, the undersigned will construe Shelton's Amended Complaint as a supplement to his original Complaint.

was told that he could not be seen in the infirmary for any reason other than Covid and was instructed to submit a medical request for an eye examination after he was released from medical segregation. *Id.* Shelton was released from medical segregation on August 20, 2021, but did not submit a request to see medical until September 8, 2021. *Id.* At that time, he reported to Byrd Unit medical staff that he was experiencing "blurred vision, floating objects and . . . saw a bright flash of light like an orb that stayed for over a minute while in medical segregation." *Id.* at 7–8. According to Shelton, the Byrd Unit medical staff administered a "basic eye chart vision test," but otherwise "failed to write in the medical report about the flash of light." *Id.* at 8.

Shelton went to see the Byrd Unit medical staff again on September 17, 2021, without submitting a request because "he was afraid for his eyesight as it was worsening." *Id.* During that visit, he reported "increased blurry vision and orbs of light," but was again only administered a basic eye chart test. *Id.* Shelton asked how soon he could be examined by an eye specialist and was told that an appointment would be made. *Id.* But, he claims, another member of the Byrd medical staff "yelled at the plaintiff not to come into medical again to complain about his vision because the plaintiff 'needed glasses.'" *Id.*

Five days later, on September 22, 2021, Shelton arrived via transfer at the Wallace Unit in the Abilene Division of the Northern District of Texas. *Id.* at 9. During his intake processing, Wallace Unit medical administrator Christine M. Heady acknowledged that there was a referral to see a specialist in Shelton's file and that she would make an appointment. *Id.* But Shelton alleges that his medical record from the Byrd Unit did not contain any notes from the Byrd Unit regarding the vision symptoms he was experiencing. *Id.* at 8,

3

11–12. Eight days after his arrival at the Wallace Unit, on September 30, 2021, Shelton was examined by Wallace Unit medical staff employee Susan Boedeker and he asked about his eye appointment "as his eyesight was worsening." *Id.* Boedeker told him to submit another medical request for the appointment. *Id.*

Shelton alleges that he submitted multiple requests regarding his vision over the next several weeks and was finally called to the medical unit on October 21, 2021, when he again saw Boedeker. *Id.* at 9–10. During this visit, he reported "floating objects, blurred vision, white balls of light and a significant loss of peripheral vision in his left eye." *Id.* at 10. Shelton states that Boedeker administered a basic eye chart test, but "did not know why I could not see and had her co-worker, defendant Sandra Castillo, do the same basic eye test." *Id.* Both Boedeker and Castillo told Shelton that he would be referred to a specialist. *Id.*

Ten days later, on November 1, 2021, Shelton walked into the medical unit and again complained about his vision and demanded to see a specialist immediately. *Id.* He states that Boedeker and Castillo told him to submit a request and to stop coming into medical without an appointment because it was not an emergency. *Id.* Later that day, Shelton walked into the Unit Major's office and pleaded for him to do something. *Id.* He was then issued a referral to see a specialist and was taken to Texas Tech University Medical Center (TTUMC) two days later, on November 3, 2021. *Id.* at 10–11. At TTUMC, Shelton was diagnosed with a detached retina and the TTUMC ophthalmologist performed surgery to repair the retina on November 8, 2021. *Id.* at 11.

Shelton recalls that when he returned from TTUMC after his initial exam and before his surgery, Heady, Boedeker, and Castillo all asked him what had happened. *Id.* He explained that he had been diagnosed with a retinal detachment. At this point, Shelton states that Castillo reviewed his medical file and acknowledged that flashes of light were a symptom of retinal detachment and asked him why he had not reported that symptom earlier. Shelton told her that he did report seeing orbs and white balls of light at both the Byrd Unit and the Wallace Unit, but that his reports were not documented. *Id.* at 11–12.

Shelton was seen at TTUMC for a follow-up visit on November 30, 2021. *Id.* at 12. During the follow-up visit, he discussed his concern that he lacked peripheral vision even after the surgery. *Id.* He claims that the ophthalmologist told him that this was due to "the amount of time had passed [and] that there would be permanent damage to his left eye." Shelton states that during this visit, the following interaction between him and the ophthalmologist, Dr. Kelly Mitchell, took place:

> The Plaintiff was concerned about how he still can't see out of his peripheral vision. Dr. Kelly Mitchell stated to the plaintiff that unfortunately because of the amount of time had passed that there would be permanent damage to his left eye.

*Id.*

After the surgery, on December 20, 2021, Shelton states that he "felt a searing pain and saw a bright flash of light." *Id.* He states that he reported this to medical at Middleton Unit and was then sent to Hendrick Medical Center where he was seen and treated by Dr. Anthony Rossettie, who then determined that "there was further retinal detachment." *Id.* at 13. Shelton states that on December 21, 2021, he was then seen again by Dr. Mitchell and

5

Shelton alleges that "there was further retinal detachment with a retinal break and [Dr. Mitchell] admitted the plaintiff for surgery." *Id.* During a post-surgery follow up with Dr. Mitchell, Shelton states:

> [I] told Dr. Kelly Mitchell that there was even more vision loss and asked if he would regain his vision. Dr. Kelly Mitchell said that he did minimal surgery for the first time to try to save as much as he could, but the barricade did not hold up. [I] asked if it was due to how much time had passed. Dr. Kelly Mitchell told the [me] that it was very unfortunate that so much time had passed because the longer it took for him to get proper diagnosis, that much of his eyesight could have been saved.

*Id.* at 12–13. Shelton was then transferred from Wallace Unit to Memorial Unit. *Id.* at 14. Shelton brings claims against Defendants alleging that they were deliberately indifferent to his medical needs. He avers that Defendants failed to provide adequate medical care which led to his losing vision in one eye. Dkt. No. 17 at. 4.

## II. LEGAL STANDARDS

A court must dismiss a complaint filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) (2016); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding in forma pauperis).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable

basis in law if it contains indisputably meritless legal theories. *See Id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (emphasis added). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–79). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d

at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

### III.  ANALYSIS

Shelton claims that the Defendants were deliberately indifferent to his serious medical needs because they all failed to promptly schedule his exam with ophthalmologist despite knowing the serious nature of his eye condition. Dkt. No. 25 at 3. Shelton states that

despite making several visits to medical, the only diagnostics he underwent was the administration of a basic eye chart exam. *Id.* at 5. Due to this, Shelton argues, he suffered irreparable damage to his eye because of the delay in receiving specialized treatment. *Id.*

Under the Eighth Amendment, prison officials have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation regarding medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary and wanton infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs") (emphasis in original).

"Deliberate indifference" means that the denial of medical treatment was "much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238 (5th Cir. 1985). In other words, "the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021).

To successfully claim a deliberate indifference to medical needs, a plaintiff must satisfy both an objective and subjective test. *Rogers*, 709 F.3d at 410. An inmate must first

prove an objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). The prison staff must have engaged in conduct that shows "a wanton disregard for any serious medical needs." *Treen*, 759 F.2d at 1238. "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (quoting *Estelle*, 429 U.S. at 107. "And, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)).

Shelton has undoubtedly alleged an objective exposure to a substantial risk of serious harm, *i.e.*, having a retina detach and the potential for losing his vision. He clearly disagreed with level of care provided for his eye condition and, accepting his allegations as true, was vocal about his displeasure with that care in his conversations with the Defendants. He characterizes the examinations received as nothing more than asking him to read from an eye chart. *See* Dkt. No. 25. With the benefit of hindsight, this is obviously

and woefully inadequate. The question here is what the Defendants knew both about that risk at the time and the inadequacy of their responses to it.

As explained above, it is well-settled that mere disagreement with the medical care provided by itself will not support a constitutional violation. Thus, a claim that medical personnel should have provided additional or specialized care constitutes mere disagreement over treatment, which is not actionable. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (explaining that the question of whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"). In this same vein, dissatisfaction with the lack of a closer or more thorough physical examination does not state a viable constitutional claim. *Molina v. Well Path*, No. 5:20-CV-081-BQ, 2021 WL 5343488, at *4 (N.D. Tex. Jan. 21, 2021), *See Barnes v. Johnson*, 204 F. App'x 377, 379 (5th Cir. 2006) ("[Plaintiff's] assertion that [the defendant] did no more than a cursory examination but did not conduct a more through [sic] 'physical' examination . . . alleges, at most, negligence or medical malpractice, which do not give rise to a § 1983 cause of action, and an inmate's disagreement with his medical treatment does not establish a constitutional violation.").

Shelton does not claim that he was never allowed to see the medical staff at the Wallace Unit. In the four-and-a-half weeks between his first reporting of vision problems to the Wallace Unit staff and his appointment at TTUMC, he was examined by the Wallace Unit medical staff on at least four occasions. Dkt. No. 1 at 10–11.

During his initial intake at the Wallace Unit, Heady acknowledged that his file from the Byrd Unit contained a referral for a specialist. But Shelton alleges that his file did not

11

contain notes from the Byrd Unit staff regarding the specifics for the referral or his vision symptoms. Dkt. No. 1 at 8, 11–12. Thus, Heady would not have had notes indicating that Shelton was experiencing bright flashes of light, nor does Shelton claim to have specifically informed Heady of this symptom, or any other specific symptom that would have alerted her to the urgency of the referral.

Eight days later, Shelton was seen by Boedeker who instructed him to submit another request for the specialist. Again, Shelton alleges only that he told Boedeker that his "eyesight was worsening," but does not claim to have told of the specific symptoms, including the bright flashes of light. *Id.*

Shelton alleges that he was next called to the medical unit on October 21, 2021, when he alleges, for the first time, that he reported "floating objects, blurred vision, white balls of light and a significant loss of peripheral vision in his left eye." *Id.* at 10. Shelton states that Boedeker administered a basic eye chart test, but he then states that Boedeker "did not know why I could not see and had her co-worker, defendant Sandra Castillo, do the same basic eye test." *Id.* Both Boedeker and Castillo told Shelton that he would be referred to a specialist. *Id.*

Then, on November 1, 2021, Shelton demanded to see a specialist immediately, but Boedeker and Castillo told him to submit a request and to stop coming into medical without an appointment because he did not have an emergency. *Id.* After talking with the Unit Major, he was referred to TTUMC. *Id.* at 10–11.

Except for the November 1 interaction with Boedeker and Castillo, Shelton's allegations regarding his prior interactions with the Defendants fail to support that they had

12

sufficient knowledge of the situation such that the subsequent denial of medical care would constitute wanton disregard for Shelton's rights. *See Treen*, 759 F.2d at 1238. Either through inadequate medical charting at the Byrd Unit or an assumption by Shelton that the Wallace Unit Defendants had notes from the Byrd Unit that they did not have, or both, there are too few facts to plausibly suggest that the Wallace Unit Defendants knew that Shelton was suffering from a vision-threatening condition and simply, and deliberately, ignored it.

This conclusion does not mean that the Defendants' care of Shelton was beyond reproach. They could have, and most likely should have, done more to appreciate his medical situation. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as an Eighth Amendment violation. *Farmer*, 511 U.S. at 838. In other words, deliberate indifference demands that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Here, even assuming the Wallace Defendants were aware of facts from which an inference of a substantial risk to Shelton's vision could have been drawn, there are no allegations to plausibly support that any of the Defendants drew that inference.

Accordingly, the undersigned recommends that the Court dismiss Shelton's claims against Defendants Susan Boedeker, Sandra A. Castillo, Olivia Herrera, and Christine M. Heady.

## IV. FURTHER LEAVE TO AMEND WOULD BE FUTILE

"Ordinarily, 'a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed.'" *Wiggins v. La. State Univ. – Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (per curiam) (quoting *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009)). But leave to amend is not required where an amendment would be futile, *i.e.,* "an amended complaint would still 'fail to survive a Rule 12(b)(6) motion,'" *Stem v. Gomez*, 813 F.3d 205, 215-16 (5th Cir. 2016) (quoting *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)), or where a plaintiff has already amended his claims, *see Nixon v. Abbott*, 589 F. App'x 279, 279 (5th Cir. 2015) (per curiam) ("Contrary to Nixon's argument, he was given the opportunity to amend his complaint in his responses to the magistrate judge's questionnaire, which has been recognized as an acceptable method for a *pro se* litigant to develop the factual basis for his complaint." (citation omitted)).

Here, Shelton was provided an opportunity to file an Amended Complaint and supplement his claims through his claims through the Court's questionnaire. While his responses expanded upon his claims, Shelton did not assert any claims that would have survived screening. Thus, it is unlikely he could successfully replead a claim for deliberate indifference.

## V. CONCLUSION

For the reasons explained in this FCR, the undersigned recommends that Shelton's claims of deliberate indifference to serious medical needs against the Defendants be DISMISSED for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b).

## VI. RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII. TRANSFER OF CASE

Having completed the preliminary screening of Shelton's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 1:23-CV-00117-H.

ORDERED this 30th day of April, 2024.

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE